IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA, and<br>THE STATE OF COLORADO, | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 05-CV-992-<br>) EWN-OES |
| | ) |
| THE B&B MINES, INC.,<br>FRENCH GULCH MINES, INC.,<br>DIAMOND DICK CO.,<br>ECKART PATCH CO.,<br>LITTLE LIZZIE LIMITED LIABILITY COMPANY, and<br>WIRE PATCH LIMITED LIABILITY COMPANY, | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendants. | ) |

## SETTLEMENT AGREEMENT, COVENANTS NOT TO SUE AND CONSENT DECREE

### I.    BACKGROUND

The United States of America and the State of Colorado have filed a joint complaint in

this matter.  The United States of America filed its claim pursuant to Sections 106 and 107 of the

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"),

42 U.S.C. §§ 9606 and 9607, seeking reimbursement of costs incurred and to be incurred for

response actions and natural resource damages in connection with the release or threatened release

of hazardous substances at the Wellington Oro/French Creek Superfund Site in Summit County,

Colorado.  The State of Colorado filed its claim pursuant to Section 107 of CERCLA, 42 U.S.C.

§ 9607, seeking reimbursement of costs incurred and to be incurred for response actions and

natural resource damages in connection with the release or threatened release of hazardous

substances at the Wellington Oro/French Creek Superfund Site, the IXL/Royal Tiger Site and the

Jessie Mine and Mill Site, located in Summit County, Colorado.

1

This Settlement Agreement, Covenants Not to Sue, and Consent Decree ("Consent Decree" or "Agreement") is made and entered into by and among the United States on behalf of the United States Environmental Protection Agency ("EPA") and the United States Department of Interior ("DOI") and the State of Colorado ("State") on behalf of the Colorado Department of Public Health and Environment ("CDPHE") and the Colorado Trustees for Natural Resources ("State Trustees") (collectively the "Plaintiffs"); The B&B Mines, Inc., Diamond Dick Co., Eckart Patch Co., French Gulch Mines, Inc., Little Lizzie Limited Liability Company, and Wire Patch Limited Liability Company (collectively the "Defendants" or "Sellers"); and Summit County and the Town of Breckenridge (collectively the "Buyers").

This Consent Decree is entered into pursuant to CERCLA, 42 U.S.C. §§ 9601 *et seq.* and the authority of the Attorney General of the United States to compromise and settle claims of the United States.  The State of Colorado enters into this Consent Decree pursuant to authority provided in Section 25-16-103 C.R.S.

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, 9613(b), and 9622.  This Court also has personal jurisdiction over the Settling Parties.  The Settling Parties shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## II.   DEFINITIONS

Unless otherwise expressly provided herein, terms used in this Agreement that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations, including any amendments thereto.

1.      "Action Memorandum" shall mean the Action Memorandum issued by EPA on November 24, 2002, as amended by Addendum # 1 on November 30, 2004, selecting a non-time critical removal action to address water quality in connection with metals contamination

emanating from the Wellington Oro Site, copies of which are attached hereto as Appendix 3 to this Consent Decree.

2.      "Administrative Orders" shall mean the following four (4) administrative orders issued by EPA to Sellers:  Administrative Order For Engineering Evaluation/Cost Analysis, Docket No. CERCLA-VIII-98-12, issued by EPA on April 27, 1998; Administrative Order for Non-Time Critical Removal Action, Docket No. CERCLA-VIII-98-21, issued by EPA on September 24, 1998; Unilateral Administrative Order for Engineering Evaluation/Cost Analysis, Docket No. CERCLA-VIII-99-13, issued by EPA on July 9, 1999; and Administrative Order for Access, Docket No. CERCLA-8-2000-17, issued by EPA on August 25, 2000.

3.      "Agreement" or  "Consent Decree" shall mean this Settlement Agreement, Covenants Not to Sue, and Consent Decree.

4.      "Buyers" shall mean Summit County, a body corporate and politic of the State of Colorado ("Summit County"), and the Town of Breckenridge, a municipal corporation of the State of Colorado ("Town of Breckenridge"), their departments, agencies and instrumentalities, collectively.

5.      "CDPHE" shall mean the Colorado Department of Public Health and Environment and any successor departments or agencies.

6.      "Effective Date" shall mean the date upon which this Consent Decree is entered by the Court in accordance with Section XXIV of this Agreement.

7.      "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

8.      "Existing Contamination" shall mean:

      a.      any hazardous substances, pollutants or contaminants present or existing on or under the Property as of the Effective Date of this Agreement;

3

      b.      any hazardous substances, pollutants or contaminants that migrated from the Property prior to the Effective Date of this Agreement; and,

      c.      any hazardous substances, pollutants or contaminants presently at the Property that migrate onto, under, or from the Property after the Effective Date of this Agreement.

9.      "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States or the State incurs after the Effective Date of this Agreement in reviewing or developing plans, reports and other items pursuant to this Consent Decree relating to the Wellington Oro Work, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, and costs to secure access after the Effective Date of this Consent Decree.

10.      "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).  The applicable rate of interest shall be the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.

11.      "IXL/Royal Tiger Site" shall mean that portion of the Property that comprises the IXL/Royal Tiger Mine and Mill and other facilities at that location on the south side of the Swan River, approximately one fourth of a mile east of Muggins Gulch and five stream miles from the confluence with the Blue River, covering approximately ten acres of land, including two collapsed adits, associated underground workings, two waste rock dumps, a pile of fine-grained mill tailings located below the ruins of the mill, and releases and discharges from the IXL/Royal Tiger Mine and Mill, adits, workings, waste rock dumps and tailings, the surface location of which is generally depicted on the map attached hereto in Appendix 1 to this Consent Decree.

12.     The "Jessie Mine and Mill Site" shall mean that portion of the Property that comprises the Jessie Mine and Mill and other facilities at that location on the east side of Gold Run Gulch, approximately 1.5 miles south of the Swan River and 2.7 stream miles from the confluence with the Blue River, containing an approximately 200-acre strip of land subject to 44 patented mining claims and associated underground workings and releases and discharges from the Jessie Mine and Mill, adits, workings, waste rock dumps and tailings, the surface location of which is generally depicted on the map attached hereto in Appendix 1 to this Consent Decree.

13.     "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

14.     "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral or letter.

15.     "Parties" shall mean the United States, the State, the Sellers and the Buyers.

16.     "Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States or the State paid at or in connection with the Property or the Existing Contamination, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs and costs to secure access, through the Effective Date of this Consent Decree.

17.     "Property" shall mean the approximately 1,786 acres of land located just east of the Town of Breckenridge in unincorporated Summit County in the Upper Blue River Basin that the Sellers have agreed to sell to the Buyers, and all facilities located on such Property, depicted generally on the map attached hereto in Appendix 1 to this Consent Decree and specifically described in the legal description attached hereto in Appendix 2 to this Consent Decree.  The northern border of the 1,786 acres of land is in the Swan River Valley, and the southern border extends up the south side of French Gulch.  The Property includes, but is not limited to, the

5

Wellington Oro Site, the Jessie Mine and Mill Site, and the IXL/Royal Tiger Site.  Also contained within the boundaries of the Property is a 156 acre parcel that is to be protected by a conservation easement, such easement to be held by the Continental Divide Land Trust (referred to herein as the "Easement Property").  The Easement Property is generally depicted on the map attached hereto in Appendix 1 to this Agreement.

18.     "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

19.     "Sellers" shall mean the Defendants, The B&B Mines, Inc., French Gulch Mines, Inc., Diamond Dick Co., Eckart Patch Co., Little Lizzie Limited Liability Company, and Wire Patch Limited Liability Company.

20.     "Settling Parties" shall mean the Buyers and the Sellers collectively.

21.     "State" shall mean the State of Colorado, its departments, agencies and instrumentalities.

22.     "Statement of Work" or "SOW" shall mean the statement of work for implementation of the Action Memorandum, set forth in Appendix 4 to this Consent Decree, and any modifications made thereto in accordance with this Consent Decree.

23.     "United States" shall mean the United States of America, its departments, agencies, and instrumentalities.

24.     "VCUPs" shall mean Voluntary Cleanup Applications and Plans for the Jessie Mine and Mill Site and the IXL/Royal Tiger Site as approved by CDPHE on November 24, 2004, and October 27, 2004, respectively, copies of which are attached hereto in Appendix 5 to this Consent Decree.

25.     "Wellington Oro Site" shall mean that portion of the Property that comprises the Wellington Oro Mine, associated underground workings and other facilities thereon, and releases and discharges from the Wellington Oro Mine, adits, workings, waste rock dumps and tailings,

approximately 2.2 miles upstream or east from the confluence of French Creek with the Blue River, and downstream areas of French Creek and the Blue River affected by zinc and cadmium contamination, the surface location of which is depicted generally on the map attached hereto in Appendix 1 to this Consent Decree.

26.     The "Wellington Oro Work" shall mean all activities Buyers are required to perform to implement the Action Memorandum as set forth in the Statement of Work.

### III.   STATEMENT OF FACTS

27.     This Consent Decree addresses approximately 168 patented mining claim parcels comprising approximately 1,786 acres of land located within an area known as the Golden Horseshoe, just east of the Town of Breckenridge in unincorporated Summit County, and includes, among other areas, the Wellington Oro Site, the Jessie Mine and Mill Site, and the IXL/Royal Tiger Site.

28.     Extensive placer and underground lode mining occurred throughout the Golden Horseshoe beginning in the late 1850s and continuing at times until the 1960s. Floating dredge boats were used to placer mine the valley floor for gold. Lode mining was concentrated on the steep valley sides where lead, zinc, silver sulfide and gold ores were extracted through an extensive network of adits and tunnels.

29.     The Wellington Oro Site was the largest mining operation in the valley. Its underground workings consist of over twelve miles of tunnels, adits, drifts, stopes and crosscuts, approximately half of which are below the elevation of the groundwater table.

30.     EPA and CDPHE began evaluating the Wellington Oro Site in the late 1980s under Section 319 of the Clean Water Act and conducted investigations to determine the nature and extent of contamination. In 1995, EPA continued the Wellington Oro Site investigations under the CERCLA program. In 1998, the Sellers completed an Engineering Evaluation/Cost Analysis ("EE/CA") for the Wellington Oro Site that focused primarily upon surface wastes containing

elevated levels of lead and arsenic. On September 23, 1998, EPA issued an action memorandum that provided for the consolidation and capping of roaster fines, mill tailings and waste rock (the "Capping Action Memorandum"). The Sellers performed this work under an administrative order issued by EPA, which work was completed in 1999. In 2002, EPA and the Sellers completed a second EE/CA that focused primarily upon the impact of metals being released from the Wellington Oro Site on the water quality in French Creek and the Blue River. The second EE/CA concluded that the underground workings of the Wellington Oro mine constitute the largest source of metals loading to ground and surface water and that a natural seep, referred to as FG-6C, is the primary conduit of mine pool water into French Creek. Zinc and cadmium were identified as the primary contaminants of concern. In May 2002, EPA completed an Ecological Risk Assessment ("Assessment") for the Wellington Oro Site. EPA issued the Action Memorandum, a copy of which is attached hereto in Appendix 3, to address water quality issues at the Wellington Oro Site on November 24, 2002. The Action Memorandum was amended by Addendum #1 on November 30, 2004. The Action Memorandum and Addendum #1 are referred to collectively herein as the "Action Memorandum." The non-time critical response action set forth in the Action Memorandum is referred to herein as the "Water Quality Action." The Water Quality Action provides for the collection and treatment of water at seep FG-6C. The Water Quality Action has not yet been implemented.

      31.     CDPHE, in cooperation with EPA, conducted an investigation of the Jessie Mine and Mill Site. In March 2003, CDPHE issued a Targeted Brownfields Assessment and EE/CA ("Brownfields Analysis") for the Jessie Mine and Mill Site. CDPHE characterized the nature and extent of contamination and identified the following removal action objectives: stabilization of waste rock piles and prevention of direct contact of such materials with Gold Run Gulch; isolation of contaminant sources through capping or institutional controls; decontamination, stabilization, and preservation of the mill structure; and re-routing and restoring Gold Run Gulch

to prevent leaching and metals loading.  CDPHE also identified a number of removal action
alternatives for the Jessie Mine and Mill Site and evaluated them for effectiveness,
implementability, and costs associated with each alternative.  The Brownfields Analysis also
included a Streamlined Ecological Risk Assessment for the Jessie Mine and Mill Site.  On
September 21, 2004, the Buyers submitted a Voluntary Cleanup Application to CDPHE, which
was amended on November 17, 2004, and approved on November 24, 2004, and provides for
mitigation of observed environmental impacts at the Jessie Mine and Mill Site under the
Colorado Voluntary Clean-up and Redevelopment Act, C.R.S. §§ 25-16-301 *et seq*., through the
following general actions:

    a.    Rerouting of Gold Run Gulch away from the base of the waste rock piles;

    b.    On-site stabilization of contaminants at the mill structure;

    c.    Shaft closure;

    d.    Draining up-gradient ponds to reduce potential for saturation of waste rock; and

    e.    Institutional controls to minimize contact with waste rock.

The VCUP Application for the Jessie Mine and Mill Site as approved by CDPHE is attached
hereto in Appendix 5.

    32.    CDPHE, in cooperation with EPA, conducted an investigation of the IXL/Royal
Tiger Site.  In August 2002, CDPHE issued a Targeted Brownfields Assessment and EE/CA for
the IXL/Royal Tiger Site.  CDPHE characterized the nature and extent of contamination and
identified the following removal action objectives: stabilization of waste rock piles and
prevention of direct contact of such materials with a side channel of the Swan River; isolation of
tailings through capping; and prevention of further erosion of streamside tailings by erection of a
barrier to prevent direct stream contact.  CDPHE also identified a number of removal action
alternatives for the IXL/ Royal Tiger Site and evaluated them for effectiveness, implementability,

9

and costs associated with each alternative. The Brownfields Analysis also included a Streamlined Ecological Risk Assessment for the IXL/Royal Tiger Site. On September 9, 2004, the Buyers submitted a Voluntary Cleanup Application to CDPHE, which was amended on October 15, 2004, and approved on October 27, 2004, and provides for mitigation of observed environmental impacts at the IXL/Royal Tiger Site under the Colorado Voluntary Clean-up and Redevelopment Act, C.R.S. §§ 25-16-301 *et seq*., through the following general actions:

 a.  Improving and lining the diversion of adit flow around fine-grained tailings;

 b.  Diverting Swan River surface flows to the main north channel;

 c.  Improving the tailings cover below the former mill area;

 d.  Covering streamside tailings in place; and

 e.  Institutional controls to minimize contact with waste rock.

The VCUP Application for the IXL/Royal Tiger as approved by CDPHE is attached hereto in Appendix 5.

33.  On or about November 20, 2001, Summit County and the Town of Breckenridge entered into a Purchase and Sale Agreement with the Sellers to purchase the Property as part of Buyers' open space programs. The Purchase and Sale Agreement was approved by the Board of County Commissioners and the Town Council in December 2001. In 1993 and again in 1999, a property tax mill levy was approved by County voters to fund the acquisition of important open space within Summit County. In 1997, the Town of Breckenridge established a special fund, known as the "Town of Breckenridge Open Space Fund," to use solely for the purpose of funding the Town of Breckenridge's "Open Space Plan." The Town of Breckenridge's Open Space Fund is funded from one-half of one percent of the Town of Breckenridge's sales tax revenues. In 1998, the Summit County Open Space Advisory Council and the Town of Breckenridge Open Space Advisory Commission recommended that Summit County and the Town of Breckenridge work jointly to protect the Property as open space. The Property is the

largest privately-owned, undeveloped property in the Upper Blue River Basin, rich in natural resources, recreation opportunities, and prized views and landscapes, and important to maintaining the back-country character of the area.

34.     The B&B Mines, Inc., ("B&B Mines") is a Colorado corporation, formed in 1943 by creditors of two bankrupt companies, The Royal Tigers Mine Company and The Tiger Placers Company.  Each creditor received one share of stock in B&B Mines for each dollar of debt which was owed for a total of 268,494 shares.  In 1944, the assets of the bankrupt companies, including the Property, were transferred to B&B Mines in satisfaction of the debt.  Shortly thereafter, B&B Mines began liquidating assets.  From time to time, B&B Mines leased portions of the Property and over the years received royalty payments for mineral exploration and development.

35.     There are currently more than 261,000 outstanding shares of stock of B&B Mines held by approximately 150 shareholders.  The largest shareholder is the Estate of John B. Traylor.

36.     In the 1970s, B&B Mines formed French Gulch Mines, Inc., ("French Gulch"), a Colorado corporation, giving one share of stock in the new company for each share of stock held in B&B Mines and transferring portions of the Property to French Gulch in a tax-free reorganization.  In August 1993, in order to facilitate potential development, B&B Mines and French Gulch restructured their holdings.  B&B Mines formed Diamond Dick Co. ("Diamond Dick"), a Colorado corporation, and Wire Patch Limited Liability Company ("Wire Patch"), a limited liability company under Colorado law.  French Gulch formed Little Lizzie Limited Liability Company ("Little Lizzie"), a limited liability company under Colorado law, and Eckart Patch Co. ("Eckart Patch"), a Colorado corporation, and portions of the Property were conveyed by B&B Mines and French Gulch to these other entities.

11

37.     Under the terms of the Purchase and Sale Agreement, the Sellers have agreed to sell the Property to Buyers.  The Purchase and Sale Agreement addresses the rights and obligations as between the Buyers and Sellers for implementing the Action Memorandum and the VCUPs.  Closing is conditioned in part upon the Sellers and Buyers reaching agreements with the United States and the State regarding the potential environmental liability that is addressed in this Agreement.  Nothing in this Agreement is intended to alter or modify the respective rights or obligations of the Buyers and Sellers pursuant to the Purchase and Sale Agreement.

38.     After the sale of the Property and performance of their obligations under this Agreement, Sellers intend to liquidate, distribute all remaining assets to shareholders and members, and dissolve pursuant to Colorado law.

39.     The Buyers represent, and for the purposes of this Agreement EPA and CDPHE rely upon those representations, that Buyers' involvement with the Property has been limited to performing the following environmental studies and actions:

    a.    Abandoned Mine Inventory of B&B Mines Property dated September 7, 2004, prepared for Summit County Open Space and Trails Department and Town of Breckenridge Open Space and Trails;

    b.    Site assessment to submit Voluntary Cleanup Plan Application IXL/Royal Tiger Mine and Mill Site, Summit County, Colorado;

    c.    Site assessment to submit Voluntary Cleanup Plan Application Jessie Mine and Mill Site, Summit County, Colorado;

    d.    Intermittent monitoring of discharge from FG6C from March 22, 2002 through July 26, 2004;

    e.    Environmental Assessment of the Star Placer MS#2846, Cecil Lode MS#2846, and Arthur Nall Lode MS#2846, Summit County, Colorado;

12

f.      Environmental Assessment of the Lincoln Lode MS#15356, Grant Lode MS #15356, Hayes Lode MS#15356, Garfield Lode MS #15356, Blaine Lode MS#15356, Arthur Lode MS#15356, Harrison Lode MS#15356, Cleveland Lode MS#15356, Morton Lode MS#15356, McKinley Lode MS#15356, and the Bryan Lode MS#15356, Summit County, Colorado;

g.      Studies, reports, analyses and/or data prepared in the exercise of Summit County's land use authority on the Property, including but not limited to providing written comments on reclamation permit applications;

h.      Studies, reports, analyses and/or data prepared by or for the French Gulch Remediation Opportunities Group;

i.      Written comments on Wellington Oro Site EE/CAs;

j.      Site visits and staff input into Targeted Brownfields Assessment: Engineering Evaluation and Cost Analysis, Jessie Mine and Mill Site, Summit County, Colorado;

k.      Site visits and staff input into Targeted Brownfields Assessment: Engineering Evaluation and Cost Analysis, IXL/Royal Tiger Mine and Mill Site, Summit County, Colorado;

l.      Review of the Capping Action Memorandum and the Action Memorandum;

m.      Review and analysis of response action alternatives;

n.      Review of the Wellington Oro Site Administrative Record and the documents contained therein; and

o.      Demolition of shacks and structures.

40.    The Natural Resource Trustees for the Property on behalf of the State are the Executive Director of the Colorado Department of Public Health and Environment or his

designee, the Executive Director of the Colorado Department of Natural Resources or his designee, and the Colorado Attorney General or his designee.  The Natural Resource Trustees for the Property on behalf of the United States are the appropriate representatives of the Secretary of the United States Department of the Interior (United States Fish and Wildlife Service).

41.    The purpose of this Consent Decree is to settle and resolve the Sellers' civil liability under Sections 106, 107 and 113 of CERCLA, 42 U.S.C. §§ 9606, 9607, and 9613, the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*. and the Colorado Water Quality Control Act, C.R.S. §§ 25-8-101 *et seq*. with regard to Existing Contamination discharging from the Wellington Oro Site, the Jessie Mine and Mill Site, and the IXL/Royal Tiger Site and the potential liability of the Buyers under Sections 106, 107 and 113 of CERCLA, 42 U.S.C. §§ 9606, 9607, and 9613, the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*. and the Colorado Water Quality Control Act, C.R.S. §§ 25-8-101 *et seq*. with regard to Existing Contamination discharging at or from portions of the Property which might otherwise result from Buyers becoming owners of the Property, subject to the reservations and limitations set forth in Sections XIII and XVIII.  The Parties agree to undertake all actions required by the terms and conditions of this Agreement.

42.    Summit County and the Town of Breckenridge have entered into this Agreement voluntarily and in the public interest for the purpose of performing the work described herein and to provide the public and the environment with the substantial benefit of open space that will be provided pursuant to this Agreement and the laws, regulations, and ordinances of Summit County and the Town of Breckenridge.

43.    The Parties recognize, and the Court by entering this Consent Decree finds, that this Agreement has been negotiated by the Parties in good faith, that implementation of this Agreement  will expedite the cleanup of the Wellington Oro Site, the Jessie Mine and Mill Site and the IXL/Royal Tiger Site, that its entry will avoid prolonged and complicated litigation, and

14

that this Agreement is fair, reasonable, and in the public interest. The Parties agree that entry into this Agreement by the Settling Parties, and the actions undertaken in accordance with this Agreement, does not constitute an admission of any liability by any of the Settling Parties, and that the Settling Parties deny any alleged liability.

## IV.   DUE CARE/COOPERATION

44.     The Buyers shall exercise due care at the Property with respect to the Existing Contamination and shall comply with all applicable local, State of Colorado, and federal laws and regulations. The Buyers agree to cooperate fully with EPA and CDPHE and to implement response actions at the Wellington Oro Site and voluntary cleanup actions at the Jessie Mine and Mill and IXL/Royal Tiger Sites as required by this Agreement. In the event the Buyers become aware of any action or occurrence which causes or threatens a release of a hazardous substance or a pollutant or contaminant at or from the Property that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Buyers shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release and shall, in addition to complying with any applicable notification requirements under Section 103 of CERCLA, 42 U.S.C. § 9603, or any other law, immediately notify EPA and CDPHE of such release or threatened release. Nothing in this Agreement is intended to constitute a waiver of the provisions of Sections 107(d), 121(e) or 123 of CERCLA, 42 U.S.C. §§ 9607(d), 9621(e) and 9623.

## V.   WORK TO BE PERFORMED AT THE WELLINGTON ORO SITE

45.     To address Existing Contamination at the Wellington Oro Site, the Buyers shall perform the actions necessary to implement the Action Memorandum ("Wellington Oro Work") in accordance with the Statement of Work ("SOW"), a copy of which is attached hereto and incorporated herein as Appendix 4. The actions to be implemented shall comply with applicable

15

or relevant and appropriate requirements ("ARARs") identified in the Action Memorandum, are described in greater detail in the SOW and generally include the following:

a.   Collection of water discharging at seep FG-6C, the primary source of acid mine drainage from the Wellington Oro Mine;

b.   Construction of a water treatment plant where water from seep FG-6C will be pumped and treated to neutralize the acidity of the water and remove zinc and cadmium;

c.   Discharge of treated water into infiltration galleries;

d.   Collection and disposal of metal sludges;

e.   If it is determined that the existing structure is inadequate to prevent upstream migration of non-native fish to reaches of French Creek inhabited by native aquatic species, including the Colorado River cutthroat trout population upstream of the Wellington Oro Site in French Creek, construction and long term maintenance of a drop structure or other appropriate physical barrier in French Creek that prevents such migration; and

f.   Operation of the water treatment system for twenty-four (24) hours a day, seven (7) days a week, until water discharging from seep FG-6C no longer presents or will present an unacceptable risk to the environment as determined by EPA and CDPHE.

46.   Designation of Contractor, Project Coordinators, and On-Scene Coordinator.

a.   All work performed by Buyers under this Agreement shall be under the direction and supervision of qualified personnel.  Buyers shall retain one or more contractors to perform the Wellington Oro Work and shall notify EPA and CDPHE of the name(s) and qualifications of such contractor(s)

within twenty (20) days prior to commencement of the Wellington Oro
Work.  The Buyers shall also notify EPA and CDPHE of the name(s) and
qualification(s) of any other contractor(s) or subcontractor(s) retained to
perform the Wellington Oro Work at least ten (10) days prior to
commencement of such work.  Any proposed contractor or subcontractor
must demonstrate compliance with ANSI/ASQC E-4-1994,
"Specifications and Guidelines for Quality Systems for Environmental
Data Collection and Environmental Technology Programs" (American
National Standard, January 5, 1995), by submitting a copy of the
proposed contractor's Quality Management Plan ("QMP").  The QMP
should be prepared in accordance with "EPA Requirements for Quality
Management Plans (QA/R-5)" (EPA/240/B0-1/002), or equivalent
documentation as required by EPA.  EPA in consultation with CDPHE
retains the right to disapprove of any or all of the contractors and/or
subcontractors retained by Buyers.  If EPA disapproves of a selected
contractor, Buyers shall retain a different contractor and shall notify EPA
and CDPHE of that contractor's name and qualifications within thirty (30)
days of EPA's disapproval.

b.     The Buyers designate Gary Roberts, Water Systems Manager, Town of
Breckenridge, as the Project Coordinator who shall be responsible for
administration of all actions by the Buyers required by this Agreement.
To the greatest extent possible, the Project Coordinator shall be present on
the Wellington Oro Site or readily available during the Wellington Oro
Work.

17

c.    EPA has designated Victor Ketellapper of the Office of Ecosystems Protection and Remediation, Region 8, as its On-Scene Coordinator ("OSC") and CDPHE has designated Kevin Mackey of the Hazardous Materials and Waste Management Division, Remedial Program Section, as CDPHE's Project Officer. Except as otherwise provided in this Agreement or at the direction of the OSC, Buyers shall direct all submissions required by this Agreement with respect to the Wellington Oro Site to the OSC at 999-18th Street, Suite 300, Mail Code 8EPR SR, Denver, Colorado 80202 and to the CDPHE Project Officer, 4200 Cherry Creek Drive South, Denver, Colorado 80246-1530.

d.    EPA, CDPHE, and Buyers shall have the right, subject to Paragraph 46(a), to change their respective designated OSC or Project Officer. Buyers shall notify EPA and CDPHE ten (10) days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notice.

47.    <u>Compliance with Other Laws</u>. Buyers shall perform all actions at the Wellington Oro Site required pursuant to this Agreement in accordance with all applicable local, State of Colorado, and federal laws and regulations except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 6921(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-site actions required pursuant to this Agreement shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation and after providing CDPHE an opportunity for meaningful involvement, attain applicable or relevant and appropriate requirements ("ARARs") under federal environmental or state environmental or facility siting laws identified as of the date of the Action Memorandum in the Action Memorandum.

48.    Authority of On-Scene Coordinator.  The OSC shall be responsible for overseeing Buyers' implementation of the Action Memorandum.  The OSC shall have the authority vested in an OSC by the NCP.  Absence of the OSC from the Wellington Oro Site shall not be cause for stoppage of work unless specifically directed by the OSC.

49.    Force Majeure.

a.    Buyers agree to perform the Wellington Oro Work within the time limits established under the Statement of Work unless the performance is delayed by a *force majeure*.  For purposes of this Agreement, a *force majeure* is defined as any event arising from causes beyond the control of Buyers, or of any entity controlled by Buyers, including but not limited to their contractors and subcontractors, which delays or prevents performance of any obligation under this Agreement despite Buyers' best efforts to fulfill the obligation.  *Force majeure* does not include financial inability to complete the Wellington Oro Work, or increased cost of performance.

b.    If any event occurs or has occurred that may delay the performance of any obligation under this Agreement, whether or not caused by a *force majeure* event, Buyers shall notify EPA and CDPHE orally within five (5) days of when Buyers first knew that the event might cause a delay. Within ten (10) days thereafter, Buyers shall provide to EPA and CDPHE in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Buyers' rationale for attributing such delay to a *force majeure* event if they intend to assert such a claim; and a statement as to whether, in the

opinion of Buyers, such event may cause or contribute to an endangerment to public health or welfare or the environment.  Failure to comply with the above requirements shall preclude Buyers from asserting any claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

c.     If EPA in consultation with CDPHE agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Agreement that are affected by the *force majeure* event will be extended for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation.  If EPA in consultation with CDPHE does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify Buyers in writing of its decision.  If EPA in consultation with CDPHE agrees that the delay is attributable to a *force majeure* event, EPA will notify the Buyers in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

50.   <u>Stipulated Penalties</u>.

a.   Buyers shall be liable to EPA for stipulated penalties for failure to perform the Wellington Oro Work in accordance with this Agreement as specified in Paragraph 50(b), unless excused under Paragraph 49 (*Force Majeure*).  "Compliance" by Buyers for purposes of this Paragraph shall include completion of the activities specified in Paragraph 50(b) below under the SOW, or any work plan or other plan approved under the SOW identified below in accordance with all applicable requirements of law, the SOW, and any plans or other documents approved by EPA or CDPHE pursuant to this Agreement and within the specified time schedules established by and approved under this Agreement.  The following stipulated penalties shall accrue per violation per day for any noncompliance identified in Paragraph 50(b):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $25 | 1st through 14th day |
| $50 | 15th through 30th day |
| $100 | 31st day and beyond |

b.   Compliance Milestones:

Submission of the draft work plan
Submission of preliminary design
Submission of final design
Submission of operation and maintenance plan
Submission of final report

c.   Buyers shall also be liable to EPA for stipulated penalties for discharges from the water treatment plant to be constructed as part of the Wellington Oro Work in accordance with the SOW that fail to meet thirty-day average effluent limitations for cadmium and zinc as set forth in the SOW, unless excused under Paragraph 49 (*Force Majeure*).  The following stipulated

21

penalties shall accrue per violation per day for discharges that exceed the effluent limitations:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $100 | 1st through 14th day |
| $ 200 | 15th through 30th day |
| $ 500 | 31st day and beyond |

d.    All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.

e.    All penalties accruing under Paragraph 50(a) or (c) shall be due and payable to EPA within 30 days of Buyers' receipt from EPA of a demand for payment of the penalties, unless Buyers invoke the dispute resolution procedures under Paragraph 58.  All payments to EPA shall be paid by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the Party making payment and EPA Site/Spill ID number 08-5F.  Buyers shall send the check(s) to:

Regular Mail:    Mellon Bank
EPA Region 8
Attn: Superfund Accounting
Lockbox 360859
Pittsburgh, Pennsylvania 15251-6859

Express Mail:    Mellon Bank
EPA 360859
Mellon Client Service Center, Room 154-670
500 Ross Street
Pittsburgh, Pennsylvania 15262-0001

or other such address as EPA may designate in writing or by wire transfer to:

ABA=021030004
TREAS NYC/CTR/
BNF=/AC-68011008

Wire transfers must be sent to the Federal Reserve Bank in New York.

f.     At the time of payment, Buyers shall send notice that the payment has
       been made to:

                        John Works
                        EPA Enforcement Specialist
                        U.S. EPA Region 8
                        Suite 300 (8ENF-T)
                        999-18th Street
                        Denver, CO 80202-2466

                        and

                        Kevin Mackey
                        State Project Officer
                        Colorado Department of Public Health and Environment
                        Hazardous Materials and Waste Management Division
                        Remedial Programs Section
                        4200 Cherry Creek Drive South
                        Denver, Colorado 80246-1530.

g.     The payment of penalties shall not alter in any way Buyers' obligation to
       complete performance of the work required under this Agreement.

h.     Penalties shall continue to accrue during any dispute resolution period but
       need not be paid until thirty (30) days after the dispute is resolved as
       provided in Paragraph 58 (Dispute Resolution).

i.     If Buyers fail to pay stipulated penalties when due, EPA may institute
       proceedings to collect the penalties, as well as Interest.  Buyers shall pay
       Interest on the unpaid balance, which shall begin to accrue on the date of
       demand made pursuant to Paragraph 50(e).

j.     Nothing in this Consent Decree shall be construed as prohibiting, altering,
       or in any way limiting the ability of the United States or the State to seek
       any other remedies or sanctions available by virtue of Sellers' violation of
       this Decree.  Notwithstanding any other provision of this Paragraph, the

United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Agreement.

51.   <u>Payment of Future Response Costs.</u>

    a.    Within thirty (30) days of the Effective Date, Buyers and Sellers shall each pay to EPA $100,000 for a total of $200,000 in payment and full satisfaction of Future Response Costs, to be deposited by EPA in the Wellington Oro Site Future Response Costs Special Account ("Special Account"), within the EPA Hazardous Substance Superfund. These funds will be retained and used by EPA to conduct or finance future response actions at or in connection with the Wellington Oro Site. Payment shall be made by a certified or cashier's check made payable to "EPA Hazardous Substance Superfund," referencing the Wellington Oro Site Future Response Costs Special Account, the name and address of the Party making payment and EPA Site/Spill ID number 08-5F, and sent to:

Regular Mail:    Mellon Bank
    EPA Region 8
    Attn: Superfund Accounting
    Lockbox 360859
    Pittsburgh, Pennsylvania 15251-6859

Express Mail:    Mellon Bank
    EPA 360859
    Mellon Client Service Center, Room 154-670
    500 Ross Street
    Pittsburgh, Pennsylvania 15262-0001

or other such address as EPA may designate in writing or by wire transfer to:

    ABA=021030004
    TREAS NYC/CTR/
    BNF=/AC-68011008

Wire transfers must be sent to the Federal Reserve Bank in New York.

b.      At the time of payment, Buyers and Sellers shall each send notice that

their payment has been made to:

> John Works
> EPA Enforcement Specialist
> U.S. EPA Region 8
> Suite 300 (8ENF-T)
> 999-18th Street
> Denver, CO 80202-2466
>
> And
>
> Kevin Mackey
> State Project Officer
> Colorado Department of Public Health and Environment
> Hazardous Materials and Waste Management Division
> Remedial Programs Section
> 4200 Cherry Creek Drive South
> Denver, Colorado 80246-1530.

52.   <u>Indemnification</u>.

a.      Except to the extent prohibited by the authority conferred by the State

Constitution, Buyers shall indemnify, save and hold harmless the United

States, the State, their elected officials, agents, contractors, subcontractors,

employees and representatives from any and all claims or causes of action

arising from, or on account of, negligent or other wrongful acts or

omissions of Buyers, their elected officials, directors, employees, agents,

contractors, or subcontractors, in carrying out actions pursuant to the

Agreement.  In addition, Buyers agree to pay the United States and the

State all costs incurred by the United States or the State, including but not

limited to attorneys fees and other expenses of litigation and settlement,

arising from or on account of claims made against the United States or the

State based on negligent or other wrongful acts or omissions of Buyers,

their officers, directors, employees, agents, contractors, subcontractors and

any persons acting on their behalf or under their control, in carrying out

activities pursuant to this Agreement.  Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of Buyers in carrying out activities pursuant to this Agreement. Neither Buyers nor any such contractor shall be considered an agent of the United States or the State.  The United States and the State shall give Buyers notice of any claim for which the United States or the State plans to seek indemnification pursuant to this Paragraph and shall consult with Buyers prior to settling such claim.

b.      Buyers waive all claims against the United States and the State for damages or reimbursement or for set-off of any payments made or to be made to the United State or the State arising from or on account of any contract, agreement, or arrangement between any one or more of Buyers and any person for performance of the Wellington Oro Work on or relating to the Property, including, but not limited to, claims on account of construction delays.  In addition, except to the extent prohibited by the authority conferred by the State Constitution, Buyers shall indemnify and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Buyers and any person for performance of the Wellington Oro Work on or relating to the Wellington Oro Site, including, but not limited to, claims on account of construction delays.

53.     <u>Insurance</u>.  At least seven (7) days prior to commencing any work on the Wellington Oro Site under this Agreement, Buyers shall secure, and shall maintain for the duration of the Wellington Oro Work, comprehensive general liability insurance and automobile

insurance with limits of one (1) million dollars, combined single limit or provide adequate assurances of comparable self-insurance.  Within the same time period, Buyers shall provide EPA and CDPHE with certificates of such insurance and a copy of each insurance policy or documentation of self-insurance.  In addition, for the duration of the performance of the Wellington Oro Work, Buyers shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Wellington Oro Work on behalf of Buyers in furtherance of this Agreement.  If Buyers demonstrate by evidence satisfactory to EPA after consultation with CDPHE that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Buyers need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

54.    Notice of Completion of Wellington Oro Work.  When EPA, in consultation with CDPHE, determines, after review of the Final Report as set forth in the Statement of Work, that the Wellington Oro Work has been fully performed in accordance with this Agreement with the exception of any continuing obligations required by this Agreement, including post-removal site controls, operation and maintenance, sampling and monitoring, record retention, etc., EPA will provide written notice to Buyers.  If EPA, in consultation with CDPHE, determines that any such work has not been completed in accordance with this Agreement, EPA will notify Buyers and provide a list of the deficiencies.  Buyers shall correct the deficiencies and submit a modified Final Report in accordance with the EPA notice.

**VI.    WORK TO BE PERFORMED AT THE JESSIE MINE AND MILL SITE AND THE IXL/ROYAL TIGER SITE**

55.    To address contamination at the Jessie Mine and Mill Site, the Buyers shall perform all actions necessary to implement the approved Voluntary Cleanup Plan attached hereto in Appendix 5 for this site.

27

56.     To address contamination at the IXL/Royal Tiger Site, the Buyers shall perform all actions necessary to implement the approved Voluntary Cleanup Plan attached hereto in Appendix 5 for this site.

57.     Before Buyers commence a continuous program of physical on-site work pursuant to the approved VCUPs, they shall provide public notice of the approved VCUPs in a local news publication, a copy of which notice shall be provided to EPA.  Buyers shall timely provide EPA with a copy of all substantive correspondence with CDPHE related to the VCUPs, including without limitation, any Certificate of Completion and any Application for No Further Action after completion of the VCUPs.  Before submitting any Certificate of Completion to CDPHE, Buyers shall provide EPA with a draft of the Certificate and an opportunity to comment for a period of fifteen (15) days from receipt.

## VII.    DISPUTE RESOLUTION

58.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Agreement.  The Parties to any dispute shall attempt to resolve any disagreements concerning this Consent Decree expeditiously and informally.  If a Settling Party objects to any EPA or CDPHE action taken pursuant to this Consent Decree, the objecting Settling Party shall notify as appropriate EPA or CDPHE in writing of its objection within ten (10) days of such action, unless the objection has been resolved informally.  EPA or CDPHE, as appropriate, and the objecting Settling Party shall have thirty (30) days from receipt of the written objection(s) to resolve the dispute through formal negotiations (the "Negotiation Period").  The Negotiation Period may be extended at the sole discretion of EPA or CDPHE, as appropriate.  Subject to the provisions of Section XXVIII (Modification), any agreement reached pursuant to this Section shall be in writing and shall, upon signature of the appropriate Parties, be incorporated into and become an enforceable part of this Agreement.  If EPA and an objecting

28

Settling Party are unable to reach an agreement within the Negotiation Period, the Regional

Administrator for EPA Region 8 will issue a written decision on the dispute. EPA's decision

shall be incorporated into and become an enforceable part of this Agreement unless within

ten (10) days of receipt of the decision, the objecting Settling Party files with the Court and

serves on the appropriate Parties a motion for judicial review of the decision. If CDPHE and an

objecting Settling Party are unable to reach an agreement within the Negotiation Period, the

Division Director for the CDPHE Hazardous Materials and Waste Management Division will

issue a written decision on the dispute. CDPHE's decision shall be incorporated into and become

an enforceable part of this Agreement unless within ten (10) days of receipt of the decision, the

objecting Settling Party files with the Court and serves on the appropriate Parties a motion for

judicial review of the decision. The obligations of the objecting Settling Party under this

Agreement shall not be tolled by submission of any objection for dispute resolution under this

Section. Following resolution of the dispute, as provided by this Section, the objecting Settling

Party shall fulfill the requirement that was the subject of the dispute in accordance with the

agreement reached, or with EPA or the State's decision, or with the Court's decision, whichever

occurs.

## VIII.   ACCESS/NOTICE TO SUCCESSORS IN INTEREST

59.    Commencing upon the date that they acquire title to any portion of the Property,

Buyers agree to provide to EPA and CDPHE, their authorized officers, employees, and

representatives, an irrevocable right of access at all reasonable times to the Property and to any

other property to which access is required for the implementation of response actions at the

Property, to the extent access to such other property is controlled by the Buyers, for the

purposes of overseeing response actions at the Property under federal and state law. EPA and

CDPHE agree to provide reasonable notice to the Buyers of the timing of any visits to the

Property. Notwithstanding any provision of this Agreement, EPA and CDPHE retain all of their

access authorities and rights, including enforcement authorities related thereto, under CERCLA, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and any other applicable statute or regulation, including any amendments thereto.

## IX.   FINANCIAL ASSURANCE

60.   Not more than thirty (30) days after the date that Buyers enter into a contract or contracts for the performance of all or a portion of the Wellington Oro Work, Buyers and/or their contractors shall establish and maintain financial security in the amount of $2,146,000 in the form of a surety or performance bond guaranteeing performance of all or a portion of the Wellington Oro Work covered by such contract and required to be performed by Buyers under this Agreement.

61.   Not more than thirty (30) days after the Effective Date, Buyers shall deposit $100,000 in an interest-bearing escrow account to be established at a Colorado bank or title company that will be directed under a separate escrow agreement acceptable to EPA.  The escrow agreement shall provide that in the event that water quality standards in Segment 2a of the Blue River are not achieved on a sustainable basis within five (5) years after the water treatment plant at the Wellington Oro Site is constructed and becomes operational, EPA, in consultation with the State, may withdraw all funds in the escrow account including interest and deposit such funds in the Wellington Oro Site Special Account to conduct or finance additional response actions at the Wellington Oro Site.  The Escrow Agreement shall further provide that in the event that water quality standards in Segment 2a of the Blue River are achieved on a sustainable basis, the funds in the escrow account, including interest, shall be disbursed to the Buyers.

62.     Buyers may change the form of financial assurance provided under this Section at

any time, upon notice to and approval by EPA, provided that the new form of assurance meets

the requirements of this Section.

## X.    OPEN SPACE AND LAND USE PLANNING

63.     Participation in Development of Open Space Management Plan.

       a.     The Property possesses natural resources and certain environmentally

               sensitive areas, wildlife habitat, and scenic and recreational lands

               ("Conservation Values").  Future planning for the Property by the Buyers

               relating to open space management, natural resource restoration and

               Conservation Values shall include participants from DOI and the Colorado

               Department of Natural Resources in accordance with the Memorandum of

               Understanding (MOU) attached hereto as Appendix 6.

       b.     Not more than thirty (30) days after the Effective Date of this Agreement,

               Buyers shall pay to DOI $50,000 and Sellers shall pay $150,000 to DOI

               to fund its activities under the MOU.  Payments shall be made by

               FedWire Electronic Transfer (EFT) to the DOI Restoration Fund ALC at

               the Federal Reserve Bank, New York, NY, referencing ABA No. _____,

               DOJ Case No. _____, and the Wellington Oro/French Gulch Site,

               Breckenridge, Colorado.  Payment shall be made in accordance with

               additional specific instructions provided to the Settling Parties by the

               NRDAR Fund Accountant, DOI, telephone number (303) 969-7170

               following lodging of this Consent Decree.  Any payments received by DOI

               after 4:00 p.m. Eastern time will be credited on the next business day.

c.      At the time of payment to DOI, Settling Parties shall send notice that such

payment has been made to DOI and DOJ in accordance with

Section XXIII (Notices and Submissions) and to:

> Department of Interior
> Natural Resource Damage Assessment
>  and Restoration Program
> Attn: Restoration Manager
> 1849 C Street, NW
> Mailstop 4449
> Washington, D.C.  20240

> And:

> Kevin Mackey
> State Project Officer
> Colorado Department of Public Health and Environment
> Hazardous Materials and Waste Management Division
> Remedial Programs Section
> 4200 Cherry Creek Drive South
> Denver, Colorado 80246-1530.

The notice shall reference DOJ Case No. _____, the Wellington

Oro/French Gulch Site and the name of the Party making the payment.

64.     Buyers agree that they shall maintain, use, or otherwise hold the Property (except

for the Easement Property, which is addressed below) in "Public Open Space" in perpetuity.

For the purposes of this Agreement, "Public Open Space" shall mean land that is left in

predominantly an undeveloped state and which provides for one or more of the following

community benefits as determined by Buyers:  (i) extensions to existing undeveloped open space

lands; (ii) buffers to developed areas; (iii) view corridors; (iv) access to trails, trailheads, water

bodies or National Forest area; (v) passive recreation uses; (vi) active recreation uses, including

but not limited to, recreational trails, consistent with the open space character of the Property

under the Town of Breckenridge's and Summit County's Open Space Plans and determined in

accordance with the Town of Breckenridge's and Summit County's public processes; (vii) unique

ecological habitats; and (viii) historical sites.  The term "Public Open Space" shall include those

uses provided from time to time:  (i) in the "Town of Breckenridge Open Space Plan" as adopted and amended from time to time by the Town Council of the Town of Breckenridge pursuant to Section 3-5-2 of the Breckenridge Town Code or any successor ordinance; and (ii) in the "Summit County Open Space Protection Plan," or its equivalent, as adopted and amended from time to time by the Board of County Commissioners of Summit County.  The term "Public Open Space" shall exclude the following:  golf course (this exclusion does not apply to Frisbee golf), swimming pool, or a substantial recreation center building (*i.e.*, over 10,000 square feet).   No recreation center building may be constructed or maintained on the Easement Property.  Buyers agree that they shall maintain and manage the Easement Property consistent with the terms of the conservation easement to be held by the Continental Divide Land Trust.  Such conservation easement shall be in form and substance substantially similar to that attached hereto as Appendix 9.

65.    In order to assure that the Property (except for the Easement Property, which is addressed below) will be maintained, used, or otherwise held as Public Open Space in perpetuity, the Buyers shall execute and, within thirty (30) days of the Effective Date, record in the real property records of the Clerk and Recorder of Summit County, Colorado, the Restrictive Covenant, a copy of which is attached hereto as Appendix 7.  Buyers shall also, within sixty (60) days of the Effective Date, execute and grant to CDPHE, environmental covenants as provided in Sections 25-15-317 to 327 C.R.S. for the Wellington Oro, IXL/Royal Tiger and Jessie Mine and Mill Sites, in form and substance substantially identical to those attached hereto in Appendix 8. Buyers shall also within 90 days of the Effective Date, execute and record a conservation easement, in form and substance substantially similar to that attached hereto as Appendix 9, on the Easement Property.  Buyers shall also provide to DOI, EPA and the State a copy of the conservation easement granted to the Continental Divide Land Trust for the Cobb and Ebert MS #340 within thirty (30) days after such conservation easement has been executed and recorded.

## XI.   BUYERS' CERTIFICATION

66.      By entering into this Agreement, each Buyer certifies that to the best of its

knowledge and belief it has fully and accurately disclosed to EPA and CDPHE all information

known to such Buyer which relates in any way to any Existing Contamination or any past or

potential future release of hazardous substances or pollutants or contaminants at or from the

Property and to its qualification for this Agreement.   Each Buyer also certifies that to the best of

its knowledge and belief it has not caused or contributed to a release or threat of release of

hazardous substances or pollutants or contaminants at the Property.   Subject to the dispute

resolution provisions of Paragraph 58, if the United States or the State determines that

information provided by Buyers is not materially accurate and complete, the Agreement, within

the sole discretion of the United States or the State, shall be null and void as to Buyers and the

United States and the State reserve all rights they may have.

## XII.   COVENANTS NOT TO SUE TO BUYERS

67.      Covenants Not to Sue to Buyers.

a.      Subject to the Reservation of Rights in Section XIII of this Agreement, and

upon completion of the work specified in Section V (Work to be

Performed at Wellington Oro Site), Section VI (Work to be Performed at

the Jessie Mine and Mill Site and IXL/Royal Tiger Site), and Section X

(Open Space and Land Use Planning), the United States and the State

covenant not to sue or take any other civil, judicial or administrative action

against Buyers, and their elected officials, representatives or employees to

the extent such officials, representatives, or employees' liability arises

solely from their status as officials, representatives, or employees, for any

and all civil liability for injunctive relief, reimbursement of response costs,

and/or contribution pursuant to Sections 106, 107, and/or 113 of

CERCLA, 42 U.S.C. §§ 9606, 9607 and/or 9613, with respect to the Existing Contamination associated with the Property.  Subject to the Reservation of Rights in Section XIII of this Agreement, and upon completion of the work specified in Section V (Work to be Performed at Wellington Oro Site), Section VI (Work to be Performed at the Jessie Mine and Mill Site and IXL/ Royal Tiger Site), and Section X (Open Space and Land Use Planning), the United States further covenants not to sue or take any other civil, judicial or administrative action against Buyers, their elected officials, representatives, or employees, for any and all civil liability for injunctive relief and/or civil penalties pursuant to Sections 309(a), (b), (d), and/or (g), and/or 311 of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1319 (a), (b), (d), and/or (g), and/or 1321, with respect to Existing Contamination discharging at or from the Wellington Oro Site, the IXL/Royal Tiger Site and the Jessie Mine and Mill Site.  Subject to the Reservation of Rights in Section XIII of this Agreement, and upon completion of the work specified in Section V (Work to be Performed at Wellington Oro Site), Section VI (Work to be Performed at the Jessie Mine and Mill Site and IXL/Royal Tiger Site), and Section X (Open Space and Land Use Planning), the State further covenants not to sue or take any other civil, judicial or administrative action against Buyers, their elected officials, representatives, or employees, for any and all civil liability for injunctive relief and/or penalties pursuant to the Colorado Water Quality Control Act, C.R.S. §§ 25-8-101 *et seq*., with respect to Existing Contamination discharging at or from the Property.

b.      <u>Covenants Not to Sue for Natural Resource Damages to Buyers</u>.  Except

as specifically provided in Section XIII (Reservations of Rights as to

Buyers), the United States and the State each covenant not to sue or to

take any other civil, judicial, or administrative action against Buyers, their

elected officials, representatives or employees to the extent such officials,

representatives, or employees' liability arises solely from their status as

officials, representatives, or employees for recovery of natural resource

damages under Section 107 of CERCLA, 42 U.S.C. § 9607, relating to

releases of hazardous substances with respect to the Existing

Contamination associated with the Property.  This covenant not to sue

shall be effective upon completion of the work specified in Section V

(Work to be Performed at the Wellington Oro Site), Section VI (Work to

be Performed at the Jessie Mine and Mill Site and IXL/Royal Tiger Site)

and Section X (Open Space and Land Use Planning).

## XIII.    RESERVATION OF RIGHTS AS TO BUYERS

68.      The United States' and the State's covenant not to sue set forth in Section XII

above do not pertain to any matters other than those expressly specified in Section XII.  The

United States and the State each reserve and this Agreement is without prejudice to all rights

against Buyers with respect to all other matters, including but not limited to, the following:

a.      Claims based on a failure by Buyers to meet a requirement of this

Agreement, including but not limited to Section IV (Due

Care/Cooperation), Section V (Work to be Performed at the Wellington

Oro Site), Section VI (Work to be Performed at the Jessie Mine and Mill

Site and IXL/Royal Tiger Site), Section VIII (Access/Notice to Successors

in Interest), and Section X (Open Space and Land Use Planning).

36

b.      Any liability resulting from past or future releases of hazardous substances or pollutants or contaminants, at or from the Property caused or contributed to by Buyers, their successors, assignees, lessees or sublessees, except as a result of Buyers performance of response actions in accordance with this Agreement, the SOW and/or the VCUPs;

c.      Any liability resulting from exacerbation by Buyers, their successors, assignees, lessees or sublessees, of Existing Contamination except as a result of Buyers performance of response actions in accordance with this Agreement, the SOW and/or the VCUPs;

d.      Any liability resulting from the release or threat of release of hazardous substances or pollutants or contaminants at the Property after the effective date of this Agreement, not within the definition of Existing Contamination;

e.      Criminal liability;

f.      Liability for violations of storm water requirements under the Colorado Water Quality Control Act or the Federal Water Pollution Control Act to the extent any such violations arise from activities conducted by Buyers after the effective date of this Consent Decree resulting in discharges to which storm water requirements would be applicable.  Nothing in this subparagraph 68(f) shall be construed as a waiver of Section 121(e) of CERCLA, 42 U.S.C. § 9621(e); and

g.      Liability for violations of local, State or federal law or regulations.

69.     With respect to any claim or cause of action asserted by the United States or the State, the Buyers shall bear the burden of proving that the claim or cause of action, or any part thereof, is attributable solely to Existing Contamination.

70.     Nothing in this Agreement is intended as a release or covenant not to sue for any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the United States or the State may have against any person, firm, corporation or other entity not a party to this Agreement.

71.     Nothing in this Agreement is intended to limit the right of EPA or CDPHE to undertake future response or cleanup actions at the Property or to seek to compel parties other than the Settling Parties to perform or pay for response or cleanup actions at the Property. Nothing in this Agreement shall in any way restrict or limit the nature or scope of response actions which may be taken or be required by EPA or CDPHE in exercising their authority under state or federal law. Buyers acknowledge that they are acquiring Property where response actions may be required.

## XIV.     BUYERS' TRANSFER OF COVENANT

72.     Subject to the provisions in Section VIII (Access/Notice to Successors in Interest) and Section X (Open Space and Land Use Planning), all of the rights, benefits and obligations conferred upon Buyers under this Agreement may be assigned or transferred to any person with the prior written consent of EPA and CDPHE in their sole discretion, provided, however, that in the event that Buyers assign or transfer an interest in all or any portion of the Property to a quasi-governmental entity established to accomplish the objectives of this Consent Decree, Buyers shall promptly notify EPA and CDPHE of such transfer but need not obtain prior written approval.

73.     Buyers agree to pay the reasonable costs incurred by EPA and CDPHE to review any subsequent requests for consent to assign or transfer the benefits and obligations conferred by this Agreement.

74.     In the event of an assignment or transfer of any portion of the Property or an assignment or transfer of an interest in a portion of the Property, the assignor or transferor shall

continue to be bound by all the terms and conditions, and subject to all the benefits, of this Agreement except as EPA and CDPHE and the assignor or transferor agree otherwise and modify this Agreement, in writing, accordingly. Moreover, prior to any assignment or transfer of any portion of the Property, the assignee or transferee must consent in writing to be bound by the terms of this Agreement including but not limited to the certification requirement in Section XI of this Agreement and the land use provisions set forth in Section X of this Agreement in order for the Covenant Not to Sue in Section XII to be available to that party. The Covenant Not To Sue in Section XII shall not be effective with respect to any assignees or transferees who fail to provide such written consent to EPA and CDPHE. Further, if Buyers make any assignments or transfers without complying with the terms and conditions of this Section, Buyers shall pay into the State's natural resource damage fund an amount equal to the sales price received by Buyers on account of such transfer or assignment. The State in its discretion may waive all or a portion of any such payment required to be made by Buyers. The provisions of this Paragraph 74 do not apply to an assignment or transfer to a Settling Party.

### XV.   BUYERS' COVENANTS NOT TO SUE

75.     In consideration of the Covenant Not To Sue in Section XII of this Agreement, the Buyers hereby covenant not to sue and not to assert any claims or causes of action against the United States, the State, their authorized officers, employees, or representatives, and the Sellers and their directors, officers and employees with respect to the Property or this Agreement, including but not limited to:

      a.     any direct or indirect claims for reimbursement from the Hazardous Substance Superfund established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507, through CERCLA Sections 106(b)(2), 111, 112, or 113, 42 U.S.C. §§ 9606(b)(2), 9611, 9612, or 9613, or any other provision of law;

      b.      any claim against the United States, the State, or the Sellers, including any department, agency or instrumentality of the United States or the State or Sellers under CERCLA Sections 107 or 113, 42 U.S.C. §§ 9607 or 9613, related to the Property; or

      c.      any claims arising out of response activities at or in connection with the Property, including claims based on EPA's or CDPHE's oversight of such activities or approval of plans for such activities, or claims under the United States Constitution, the Colorado Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law,

unless the United States or the State first asserts a claim against the Buyers relating to the Property and the claim arises out of the same transaction or occurrence.

Nothing in this Agreement shall preclude Buyers from requesting state or federal grant funding to undertake any work required under this Agreement or any work on or related to the Property. Nothing in this Agreement is intended to waive or otherwise limit any defenses or counterclaims that Buyers may have in the event the United States or the State brings an action against Buyers pursuant to Section XIII.

76.     The Buyers reserve, and this Agreement is without prejudice to, actions against the United States or the State based on negligent actions taken directly by the United States or the State, not including oversight or approval of the Buyers' plans or activities, that are brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA. Nothing herein shall be deemed to constitute preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d), nor a waiver of the State's governmental immunity provided in C.R.S. §§ 24-10-101 to 120.

### XVI.    PAYMENT OF PAST RESPONSE COSTS BY SELLERS

77.    Not more than thirty (30) days after the Effective Date of this Consent Decree, Sellers shall pay to EPA from the proceeds from the sale of the Property $718,432 for reimbursement and full satisfaction of Past Response Costs.  Upon payment of this amount and any other amounts required of Sellers pursuant to this Agreement, Sellers shall liquidate and distribute all remaining assets to shareholders and members.  EPA acknowledges that Sellers' obligations under the Administrative Orders have been satisfied and the Administrative Orders have been completed.  All payments to EPA shall be made by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the Party making payment and EPA Site/Spill ID number 08-5F or by FedWire Electronic Funds Transfer.  Sellers shall send the check(s) to:

Regular Mail:    Mellon Bank
EPA Region 8
Attn: Superfund Accounting
Lockbox 360859
Pittsburgh, Pennsylvania 15251-6859

Express Mail:    Mellon Bank
EPA 360859
Mellon Client Service Center, Room 154-670
500 Ross Street
Pittsburgh, Pennsylvania 15262-0001

or other such address as EPA may designate in writing or by wire transfer to:

ABA=021030004
TREAS NYC/CTR/
BNF=/AC-68011008

Wire transfers must be sent to the Federal Reserve Bank in New York.  Any payments received after 4:00 p.m. Eastern Time will be credited on the next business day.

78.     At the time of payment, Sellers shall send notice that the payment has been made to:

> John Works
> EPA Enforcement Specialist
> U.S. EPA Region 8
> Suite 300 (8ENF-T)
> 999-18th Street
> Denver, CO 80202-2466
>
> And:
>
> Kevin Mackey
> State Project Officer
> Colorado Department of Public Health and Environment
> Hazardous Materials and Waste Management Division
> Remedial Programs Section
> 4200 Cherry Creek Drive South
> Denver, Colorado 80246-1530

79.     If Sellers fail to make any payment required by Paragraph 77 by the required due date, Interest shall accrue on the unpaid balance through the date of payment.

80.     If any amounts due to EPA under Paragraph 77 are not paid by the required date, Sellers shall be in violation of this Agreement and shall pay to EPA, as a stipulated penalty, in addition to the Interest required by Paragraph 78, $100 per day that such payment is late. Stipulated penalties are due and payable not more than thirty (30) days after the date of demand for payment of the penalties by EPA.  All payments to EPA under this Paragraph shall be identified as "stipulated penalties" and shall be made in the manner set forth in Paragraphs 77 and 78.

81.     Penalties shall accrue as provided above regardless of whether EPA has notified Sellers of the violation or made a demand for payment, but need only be paid upon demand.  All penalties shall begin to accrue on the day after payment is due and shall continue to accrue through the date of payment.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Agreement.

82.     In addition to the Interest and Stipulated Penalty payments required by this Section and any other remedies or sanctions available to the United States by virtue of Sellers'

failure to comply with the requirements of this Agreement, any Seller who fails or refuses to comply with any term or condition of this Agreement shall be subject to enforcement action pursuant to Section 122(h)(3) of CERCLA, 42 U.S.C. § 9622(h)(3).  If the United States brings an action to enforce the Past Response Costs payment provisions of this Agreement, Sellers shall reimburse the United States for all costs of such action, including but not limited to costs of attorney time.

83.     The obligations of Sellers to pay amounts owed to EPA under this Agreement are joint and several.  In the event of the failure of any one or more Seller to make the payments required under this Agreement, the remaining Sellers shall be responsible for such payments.

84.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive payment of any portion of the stipulated penalties that have accrued pursuant to this Agreement.  Sellers' payment of stipulated penalties shall not excuse Sellers from performance of any other requirements of this Agreement.

## XVII.   COVENANTS NOT TO SUE TO SELLERS

85.     Covenants Not to Sue to Sellers.

      a.     Except as specifically provided in Section XVIII (Reservations of Rights as to Sellers), the United States and the State covenant not to sue or to take any other civil, judicial, or administrative action against Sellers and/or their directors, officers or employees to the extent such directors, officers or employees' liability arises solely from their status as directors, officers, or employees pursuant to Sections 106, 107(a), and 113 of CERCLA, 42 U.S.C. §§ 9606, 9607(a) and 9613 with regard to the Property and the Existing Contamination.  With respect to present and future liability, this covenant shall take effect upon receipt by EPA of all amounts required to be paid by Sellers by Section XVI (Payment of Past Response Costs By

Sellers) and Paragraph 51 (Payment of Future Response Costs) and receipt by DOI of all amounts required to be paid by Sellers by Section X (Open Space and Land Use Planning).  Except as specifically provided in Section XVIII (Reservations of Rights as to Sellers), the United States and the State further covenant not to sue or take any other civil, judicial or administrative action against Sellers and/or their directors, officers or employees to the extent such directors, officers, or employees' liability arises solely from their status as officers, directors, or employees, for any and all civil liability for injunctive relief and/or civil penalties pursuant to Sections 309(a), (b), (d), and/or (g), and/or 311 of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1319 (a), (b), (d), and/or (g), and/or 1321, and/or the Colorado Water Quality Control Act, C.R.S. §§ 25-8-101 *et seq.*, with respect to Existing Contamination discharging at or from the Wellington Oro Site, the IXL/ Royal Tiger Site and the Jessie Mine and Mill Site.  This covenant not to sue is conditioned upon the satisfactory performance by Sellers of their obligations under this Agreement.  This covenant not to sue extends only to Sellers and their directors, officers and employees and does not extend to any other person.

b.     Covenants Not to Sue for Natural Resource Damages to Sellers.

Except as specifically provided in Section XVIII (Reservations of Rights as to Sellers), the United States and the State each covenant not to sue or to take any other civil, judicial, or administrative action against Sellers and/or their directors, officers or employees to the extent such officers' directors', and employees' liability arises solely from their status as officers, directors, or employees for recovery of natural resource damages under Section 107 of CERCLA, 42 U.S.C. § 9607 relating to releases of hazardous substances with respect to the Existing Contamination associated with the Property.  This covenant not to sue shall be effective upon receipt by EPA of all amounts required to be paid by Sellers by Section XVI (Payment of Past Response Costs By Sellers) and Paragraph 51 (Payment of Future Response Costs) and receipt by DOI of all amounts required to be paid by Sellers by Section X (Open Space and Land Use Planning) and the recordation of the conservation easement on the Easement Property pursuant to Paragraph 65.

## XVIII.   RESERVATIONS OF RIGHTS AS TO SELLERS

86.   Reservations of Rights.

a.     The United States and the State each reserve, and this Agreement is without prejudice to, all rights against Sellers with respect to all matters not expressly included within the Covenant Not to Sue in Section XVII. Notwithstanding any other provision of this Agreement, the United States and the State each reserve all rights against Sellers with respect to:

(i)     liability for failure of Sellers to meet a requirement of this Agreement;

(ii)     criminal liability;

45

(iii)   liability, based upon Sellers' ownership or operation of the

Property, or upon Sellers' transportation, treatment, storage,

or disposal, or the arrangement for the transportation, treatment,

storage, or disposal, of a hazardous substance or a solid waste at or

in connection with the Property, after the Effective Date of this

Agreement; and

(iv)   liability arising from the past, present, or future disposal, release or

threat of release of a hazardous substance or pollutant, or

contaminant outside of the Property and outside of Existing

Contamination.

b.   <u>Natural Resource Damages Reservations as to Sellers</u>.

Notwithstanding any other provision of this Agreement, the United States

and the State each reserve the right to institute proceedings against the Sellers

seeking recovery of natural resource damages arising from:

(i)   injury to, destruction of, or loss of natural resources and the cost of

assessing such injury, destruction, or loss that results from a

release of any kind of hazardous substance not identified in any

site record or administrative record maintained by the United States

Fish and Wildlife Service with respect to the Existing

Contamination associated with the Property as of the date of

lodging of the Consent Decree; or

(ii)   injury to, destruction of, or loss of natural resources and the cost of

assessing such injury, destruction or loss that results from

unanticipated, extraordinary events, which result in the release of

46

substantial additional quantities of hazardous substances, excluding any such event caused by Buyers; or

(iii) injury to, destruction of, or loss of natural resources and the cost of assessing such injury, destruction or loss of trust resources within a taxonomic family not addressed in the Jessie Mine and Mill Site, Wellington Oro Site, or the IXL/Royal Tiger Site files of the Fish and Wildlife Service of DOI and that is of a type of injury not identified in the Fish and Wildlife files for these Sites.

87. Nothing in this Agreement is intended to be nor shall it be construed as a release, covenant not to sue, or compromise of any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the United States or the State may have against any person, firm, corporation or other entity not a signatory to this Agreement.

## XIX. COVENANTS NOT TO SUE BY SELLERS

88. Sellers covenant not to sue and agree not to assert any claims or causes of action against the United States, the State, or their contractors or employees, and Buyers and their elected officials, representatives, and employees with respect to the Property or this Agreement, including but not limited to:

a. any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b. any claims arising out of response or cleanup actions at or in connection with the Property, including any claim under the United States Constitution, the Colorado Constitution, the Tucker Act, 28 U.S.C.

§ 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; and

c.  any claim against the United States, the State and/or the Buyers pursuant to Sections 107 and/or 113 of CERCLA, 42 U.S.C. §§ 9607 and/or 9613, relating to the Property,

unless the United States or the State first asserts a claim against the Sellers relating to the Property and the claim arises out of the same transaction or occurrence.

89.  Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. 300.700(d), or a waiver of the State's or Buyers' governmental immunity provided in C.R.S. §§ 24-10-101 to 120.

90.  Sellers agree not to assert any CERCLA claims or causes of action that they may have for all matters relating to the Property, including for contribution, against any other person. This waiver shall not apply with respect to any defense, claim, or cause of action that a Seller may have against any person if such person asserts a claim or cause of action relating to the Property against such Seller.

## XX.  PARTIES BOUND/TRANSFER OF COVENANT

91.  This Agreement shall apply to and be binding upon the United States and the State, and shall apply to and be binding upon the Settling Parties, their officers, directors, elected officials and employees. Each signatory of a Party to this Agreement represents that he or she is fully authorized to enter into the terms and conditions of this Agreement and to legally bind such Party.

## XXI.  DISCLAIMER

92.  This Agreement in no way constitutes a finding by EPA or CDPHE as to the risks to human health and the environment which may be posed by contamination at the Property nor

constitutes any representation by EPA or CDPHE that the Property is fit for any particular purpose.

## XXII.   DOCUMENT RETENTION

93.   The Settling Parties agree to retain and make available to EPA and CDPHE all business and operating records and contracts relating to the Property, Property studies and investigations, and documents relating to operations at the Property, for at least ten (10) years following the Effective Date of this Agreement unless otherwise agreed to in writing by the Parties. At the end of ten (10) years, the Settling Parties shall notify both EPA and CDPHE of the location of such documents and shall provide EPA and CDPHE with an opportunity to copy any documents at the expense of the Party requesting such copies.  The Settling Parties may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal or State law.  If the Settling Parties assert such a privilege, they shall provide to EPA and CDPHE the following:  (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by the Settling Party.  However, no documents, reports or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged.

## XXIII.   NOTICES AND SUBMISSIONS

94.   Whenever, under the terms of this Agreement, notice is required to be given or a document is required to be sent by one Party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other parties in writing.  Written notice as specified herein shall constitute complete satisfaction of

any written requirement of this Agreement with respect to the United States, the State, and the Settling Parties.

| | |
|---|---|
| As to the United States: | Chief, Environmental Enforcement Section, Environment and Natural Resources Division U.S. Department of Justice P.O. Box 7611 Washington, D.C.  20044-7611  Re:  DJ # _____ |

As to EPA:
        Andrea Madigan
        Enforcement Attorney
        US EPA Region 8
        999-18th Street, Suite 300 (ENF-L)
        Denver, Colorado  80202

        And:

        Victor Ketellapper
        EPA Project Coordinator
        US EPA Region 8
        999-18th Street, Suite 300 (EPR-SR)
        Denver, Colorado  80202

As to DOI:
        Dana Jacobson
        US Department of Interior
        Office of Regional Solicitor
        755 Parfet Street, Suite 151
        Lakewood, Colorado  80215

As to the State:
        Robert J. Eber
        Assistant Attorney General
        Colorado Department of Law
        Natural Resources and Environment Section
        Hazardous and Solid Waste Unit
        1525 Sherman Street, 5th Floor
        Denver, Colorado 80203

        And:

        Kevin Mackey
        State Project Officer
        Colorado Department of Public Health and Environment
        Hazardous Materials and Waste Management Division
        Remedial Programs Section
        4200 Cherry Creek Drive South
        Denver, Colorado 80246-1530.

As to the Buyers:               Jeffrey L. Huntley
                                Summit County Attorney
                                P.O. Box 68
                                Breckenridge, Colorado 80424

                                Todd Robertson
                                Summit County Open Space and Trails Director
                                P.O. Box 5660
                                Frisco, Colorado 80443

                                Timothy H. Berry
                                Berry & Murphy, P.C.
                                P.O. Box 2
                                Leadville, Colorado 80461

                                Timothy J. Gagen
                                Town Manager
                                Town of Breckenridge
                                P.O. Box 168
                                Breckenridge, Colorado 80424

                                Robert W. Lawrence
                                Davis Graham & Stubbs LLP
                                1550 17th Street, Suite 500
                                Denver, Colorado 80202

As to the Sellers:              The B&B Mines, Inc.
                                600 Seventeenth Street, Suite 2700 South
                                Denver, Colorado 80202-5427

                                With a copy to:

                                Denis B. Clanahan
                                Krys Boyle
                                600 Seventeenth Street, Suite 2700 South
                                Denver, Colorado 80202-5427

## XXIV.   EFFECTIVE DATE

95.     The Effective Date of this Consent Decree shall be the date upon which it is

entered as an Order of the Court.

## XXV.   TERMINATION

96.     If any Party believes that any or all of the obligations under Section VIII

(Access/Notice to Successors in Interest) are no longer necessary to ensure compliance with the

requirements of the Agreement, that Party may request in writing that the other Parties agree to

terminate the provision(s) establishing such obligations; provided, however, that the provision(s) in question shall continue in force unless and until the Party requesting such termination receives written agreement from the other Parties to terminate such provision(s).

## XXVI.  CONTRIBUTION PROTECTION

97.     With regard to claims for contribution against Settling Parties, the Parties hereto agree that the Settling Parties are entitled to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2), 42 U.S.C. § 9613(f)(2) for matters addressed in this Agreement.  The matters addressed in this Agreement are all response actions taken or to be taken,  response costs incurred or to be incurred, and natural resource damages suffered or to be suffered by the United States and the State, by the Settling Parties or by any other person with respect to Existing Contamination at the Property.

98.     The Settling Parties agree that with respect to any suit or claim for contribution brought by either or both of them for matters related to this Agreement, the appropriate Settling Party will notify the United States and the State in writing no later than sixty (60) days prior to the initiation of such suit or claim.

99.     The Settling Parties also agree that with respect to any suit or claim for contribution brought against either or both of them for matters related to this Agreement the appropriate Settling Party will notify in writing the United States and the State within ten (10) days of service of the complaint on them.

## XXVII.  ANNUAL APPROPRIATION BY TOWN AND COUNTY

100.     Notwithstanding anything herein contained to the contrary, the obligations of the Town and the County under the Consent Decree and SOW are expressly subject to an annual appropriation being made by the governing bodies of the Town and the County in amounts sufficient to allow the Town and the County to perform their respective obligations hereunder. The obligations of the Town and the County hereunder shall not constitute a general obligation

indebtedness or multiple year direct or indirect debt or other financial obligation whatsoever within the meaning of the Constitution or laws of the State of Colorado.

## XXVIII.   ATTACHMENTS

101.    The following appendices are attached to and incorporated into this Consent Decree:

> Appendix 1 – Property Map
> Appendix 2 – Legal Description of the Property
> Appendix 3 – Action Memorandum and Amendment
> Appendix 4 – Statement of Work
> Appendix 5 – Voluntary Cleanup Plans for the Jessie Mine and Mill Site and the
>                        IXL/Royal Tiger Site
> Appendix 6 – Memorandum of Understanding between DOI, State and Buyers
> Appendix 7 – Restrictive Covenant (Public Open Space)
> Appendix 8 – Environmental Covenant
> Appendix 9 – Form of Conservation Easement for Easement Property

## XXIX.   MODIFICATION

102.    Time schedules specified in the Statement of Work may be modified by agreement of the Buyers and EPA.  Time schedules specified in the VCUPs may be modified by agreement of the Buyers and the State.  All such modifications shall be made in writing.

103.    Except as otherwise provided in the SOW and VCUPs, no material modifications shall be made without written notification to and written approval of the United States, the State, the Buyers, and the Court.  Modifications to the SOW that do not materially alter that document may be made by written agreement between EPA, after providing the State with a reasonable opportunity to review and comment on the proposed modification, and the Buyers.  Modifications to the VCUPs that do not materially alter those documents may be made by written agreement between the State and the Buyers.

104.    Nothing in this Consent Decree shall be deemed to alter the Court's power to enforce, supervise or approve modifications to this Consent Decree.

## XXX.   <u>LODGING AND OPPORTUNITY FOR PUBLIC COMMENT</u>

105.    This Consent Decree shall be lodged with the Court before entry for a period of not less than thirty (30) days for public notice and comment.  The United States and the State each reserve the right to withdraw or withhold its consent to the Consent Decree if comments disclose facts or considerations which indicate that this Agreement is inappropriate, improper or inadequate.

**SO ORDERED THIS   19<u>th</u>   DAY OF<u> September </u>, 2005.**

<u>s/Edward W. Nottingham</u>
UNITED STATES DISTRICT JUDGE

IT IS SO AGREED:

FOR THE PLAINTIFF UNITED STATES OF AMERICA:
Assistant Attorney General
Environment and Natural Resources Division, U.S. Department of Justice


IT IS SO AGREED:

FOR THE PLAINTIFF UNITED STATES OF AMERICA:

Assistant Attorney General
Environment and Natural Resources Division, U.S. Department of Justice


By: s/ Kelly A. Johnson          Date:     5/16/05
    Kelley A. Johnson
    Acting Assistant Attorney General
    Environment and Natural Resources Division
    U.S. Department of Justice


By: s/ W. Benjamin Fisherow          Date:
    W. Benjamin Fisherow
    Deputy Section Chief
    Environmental Enforcement Section
    Environment and Natural Resources Division
    U.S. Department of Justice

THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGION 8

By: s/ Carol Rushin                          Date: 5/12/2005
      Carol Rushin
      Assistant Regional Administrator
      Office of Enforcement, Compliance
      and Environmental Justice
      U.S. EPA Region 8
      999 18th Street, Suite 300
      Denver, CO  80202


By: s/ Andrea Madigan                          Date: 5/10/05
      Andrea Madigan
      Enforcement Attorney
      U.S. EPA Region 8
      999 18th Street, Suite 300
      Denver, Colorado  80202

FOR THE PLAINTIFF THE STATE OF COLORADO:
COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT


By: s/ Douglas H. Benevento          Date:  5/18/05
     Douglas H. Benevento
     Executive Director
     Colorado Department of Public Health and Environment
     4300 Cherry Creek Drive South
     Denver, CO  80246-1530


COLORADO DEPARTMENT OF LAW FOR THE ATTORNEY GENERAL


By: s/ Robert J. Eber          Date:  5/20/05
     Robert J. Eber
     Assistant Attorney General
     Colorado Department of Law
     Natural Resources and Environment Section
     Hazardous and Solid Waste Unit
     1525 Sherman Street, 5th Floor
     Denver, Colorado  80203

IT IS SO AGREED:

FOR THE DEFENDANTS:

B&B MINES, INC.

By: s/ Richard Downing Jr.              Date: 5-20-2005
     Name: Richard Downing Jr.
     Address: 600 17th Str. #2700, Denver, CO 80202


FRENCH GULCH MINES, INC.

By: s/ Richard Downing Jr.              Date: 5-20-2005
     Name: Richard Downing Jr.
     Address: 600 17th Str. #2700, Denver, CO 80202


DIAMOND DICK CO.

By: s/ Richard Downing Jr.              Date: 5-20-2005
     Name: Richard Downing Jr.
     Address: 600 17th Str. #2700, Denver, CO 80202


ECKART PATCH CO.

By: s/ Richard Downing Jr.              Date: 5-20-2005
     Name: Richard Downing Jr.
     Address: 600 17th Str. #2700, Denver, CO 80202


LITTLE LIZZIE LIMITED LIABILITY COMPANY

By: s/ Richard Downing Jr.              Date: 5-20-2005
     Name: Richard Downing Jr.
     Address: 600 17th Str. #2700, Denver, CO 80202


WIRE PATCH LIMITED LIABILITY COMPANY

By: s/ Richard Downing Jr.              Date: 5-20-2005
     Name: Richard Downing Jr.
     Address: 600 17th Str. #2700, Denver, CO 80202

IT IS SO AGREED:

FOR THE BUYERS:

SUMMIT COUNTY

By: s/ Robert H.S. French_____      Date: May 19, 2005
  Robert H.S. French
  Vice Chairman, Board of County Commissioners
  Summit County, Colorado
  PO Box 68
  Breckenridge, CO 80424

TOWN OF BRECKENRIDGE

By: s/ Ernie Blake_____      Date: May 19, 2005
  Ernie Blake
  Mayor, Town of Breckenridge, Colorado
  PO Box 168
  Breckenridge, CO 80424